Daniel L. DUGGAN, as Trustee; and William G. Davies and Phyllis J. Davies, as Individuals; Phillip C. Armstrong, and Jeannette B. Armstrong, as Trustee of the Armstrong Family Trust, Plaintiffs,

v.

HIGHLAND–FIRST AVENUE CORPORATION and Creative Investments, Inc., Defendants.

Adv. No. LA 82–428720–RO.

United States Bankruptcy Court, C.D. California.

Dec. 23, 1982.

Allan D. NewDelman, Sternberg, Sternberg, Rubin & Schleier, Phoenix, Ariz., for Highland-First Avenue Corp.

Anthony Castanares, Stutman, Treister & Glatt, Los Angeles, Cal., for Daniel L. Duggan, et al.

Paul M. Van Arsdell, Jr., Latham & Watkins, Los Angeles, Cal., for Creative Investments Associates, Inc.

Edward M. Wolkowitz, Robinson, Wolas & Diamant, Los Angeles, Cal., for Essay Investments, Inc.

### MEMORANDUM OF OPINION ON REQUEST TO VACATE AUTOMATIC STAY

ROBERT L. ORDIN, Bankruptcy Judge.

On November 1, 1982, the debtor Highland-First Avenue Corporation, an Arizona corporation, filed its Ch. 11 petition in the bankruptcy court for the District of Arizona. The debtor corporation was formed approximately four days prior to filing the Ch. 11 case. Thereafter, on November 22, 1982, the plaintiffs filed a complaint in the bankruptcy court in the Central District of California, seeking to vacate the automatic stay which resulted from the debtor's filing of the Ch. 11 case in Arizona.

On December 16, after a hearing before the bankruptcy judge in the "home court" in Arizona, the bankruptcy judge in Arizona ordered that proceedings on the plaintiffs' complaint seeking to vacate the stay should be conducted in the bankruptcy court in the Central District of California, and that the trial of those issues should proceed before the bankruptcy judge in Los Angeles.[1] The trial was held December 21, 1982.

1. In view of this order of the Bankruptcy Judge in the "home court" in Arizona, no venue issue exists in this case, and the Court is not faced with the type of venue or jurisdiction problems addressed in *Coleman American*, 6 B.R. 251 (Bkrtcy.1980) (Clark), and *Coleman American*, 8 B.R. 384, 7 B.C.D. 127 (Bkrtcy.1981) (Pusateri).

The circumstances surrounding the formation of the Arizona debtor corporation are so interwoven with the affairs and conduct of another entity, Creative Investments, Inc., and another bankruptcy proceeding pending in the Central District of California, in which the debtor is Essay Investments, Inc., that a resume of certain facts relating to Highland, Creative, and Essay is essential to an understanding of the problems and issues before this Court.

Essay Investments, Inc. (Essay), became the debtor in a Ch. 11 case commenced on April 14, 1982, in the Central District of California. The assets of Essay's estate included three parcels of real property located in Arizona referred to respectively as the Highland property, the Pasadena property, and the Mariposa property. The Pasadena and Highland parcels were subject to a senior encumbrance in favor of a group of individuals and entities which for convenience will be referred to hereafter as Duggan and Davies. The Highland and Pasadena parcels were also subject to junior encumbrances in favor of Creative Investments Associates, Inc., a California corporation, (Creative). Complaints for relief from the automatic stay were filed by Duggan and Davies, and as a result, judgments were entered by stipulation which dissolved the automatic stay and provided for stay of execution until October 15, 1982, as to Duggan, and until November 1, 1982, as to Davies. These judgments were entered on July 8 and July 23, 1982.

Creative also sought relief from the automatic stay in the Essay Ch. 11 proceeding, and on September 2, 1982, a judgment by stipulation was entered relieving Creative from the automatic stay, upon condition that the judgment was stayed until October 15, 1982.

Creative is a California corporation engaged in the business of executing tax deferred exchanges on behalf of investors. Creative's sole shareholders and officers are Sid Garrett and Jerry Gertz. Its offices are in the Central District of California. The day-to-day business affairs and activities of Creative are conducted by Garrett and Gertz. Since the default by Essay, Creative has been unable to pay its debts and has considered filing its own bankruptcy petition.

As a result of the judgments permitting Duggan and Davies to proceed with foreclosure on or after November 2, Creative was faced with the potential that sale on foreclosure by the senior encumbrancers would wipe out Creative's interest as a junior lienor, unless Creative paid the indebtedness to the senior lienors or made other financial arrangements agreeable to the senior lienors. Creative recognized this economic reality and that its position as a junior encumbrancer was at hazard and its interests would be destroyed if the senior liens were foreclosed. Garrett and Gertz responded vigorously. They undertook intensive negotiations with the senior encumbrancers. In addition, they pursued all available avenues to accomplish a sale of the property which would produce sufficient funds to eliminate the foreclosure problems. They were unsuccessful. They were unable to negotiate a settlement with the senior lienors and they were unable to arrange a sale of the property. The Duggan and Davies foreclosure sales were set for November 4 and November 2, 1982. As each day passed without a solution, the pressure mounted. The technique chosen by Creative to solve its problem is the source and subject matter of this opinion.

The Los Angeles firm of Latham & Watkins acted as attorneys for Creative in connection with the Pasadena and Highland parcels and the Essay bankruptcy. Paul Van Arsdell, Jr. was the attorney in that firm that handled the matter. Counsel for the debtor, Essay, was the Los Angeles firm of Robinson, Wolas & Diamant. The attorney in that firm handling the Essay bankruptcy was Edward M. Wolkowitz.

Van Arsdell and his clients concluded in mid-October that Creative's only remaining alternatives to prevent the Duggan and Davies foreclosure sales were: (1) to institute injunction proceedings in Arizona, or (ii) to invoke the aid of the bankruptcy court in Arizona. Recognizing the inade-

quacy of the financial resources available to Creative to support an injunction suit, and post the necessary bond incident to obtaining a restraining order, Van Arsdell, Garrett and Gertz pursued the second alternative: resort to the Arizona bankruptcy court. The filing of a Ch. 11 for Creative was discussed. Creative's interest in the Highland and Pasadena parcels was a junior lien holder's interest. Van Arsdell realized that the law was unclear as to whether the filing of a Ch. 11 by a junior lien holder would stay a foreclosure sale by a senior lien holder. There were other disadvantages to the filing of a Ch. 11 by Creative. The Mariposa parcel was not in distress. An escrow was pending for the sale of that property in a transaction which would provide an equity of approximately $80,000 for Creative and those of Creative's investors who were involved in the Mariposa transaction. Creative was hesitant to expose the Mariposa parcel, and the $80,000 profit, to the bankruptcy court. As a result of these deliberations, Van Arsdell, Garrett and Gertz refined and redefined their objectives: (i) to stay the Duggan and Davies foreclosure sales by resort to a bankruptcy proceeding in Arizona; and (ii) to accomplish this without exposing the Mariposa parcel and related transaction to the jurisdiction of the bankruptcy court.

At some point in time, not clear from the evidence, an Arizona lawyer, Allan D. New-Delman, of the firm of Sternberg, Sternberg, Rubin & Schleier of Phoenix, Arizona became involved in the discussions with Van Arsdell, Garrett and Gertz. They discussed and evolved the following plan.

An Arizona corporation would be formed, Highland-First Avenue Corporation. The incorporators would be Garrett and Gertz. At the time the corporation was formed, they would be its sole directors; Gertz would be the secretary, and Garrett the president. The corporation would be formed for the purpose of receiving a transfer from Creative of Creative's beneficial interest in the junior encumbrances on the Highland and Pasadena parcels. It was also intended that the new corporation acquire the underlying fee interest of Essay

in the Highland and Pasadena properties. In order to assure that the automatic stay would prevent the Duggan and Davies foreclosures, the collaborators would vest in the Arizona corporation as great a quantum of interest in the Highland and Pasadena parcels as they could arrange. The intent in creating the corporation, of course, was that it would file a Ch. 11 proceeding prior to the sale dates on the Duggan and Davies foreclosures, and invoke the automatic stay to delay and prevent the sales.

The plan was put into operation. The corporation was formed by the filing of its articles on October 28, 1982. Creative's beneficial interests in the junior encumbrances were assigned to the new corporation and the assignments were recorded in Arizona on October 29, 1982. The only thing left undone by October 29, 1982 was the transfer of Essay's interest in the Highland and Mariposa parcels to the new corporation. The techniques used to accomplish this result must now be explained in detail.

During the week of October 25th, Van Arsdell called the attorney for Essay, Wolkowitz. He advised Wolkowitz that Creative would be willing to pay Essay's estate the sum of $3,000 if Essay would execute quitclaim deeds, and deeds in lieu of foreclosure to Creative with respect to the Pasadena and Highland parcels. He explained to Wolkowitz that Creative was in imminent danger of losing its position by reason of the Duggan and Davies foreclosure sales. Essay could, by accepting this offer, acquire $3,000 for deeds to properties which were of no value to Essay. After conferring with his client, Wolkowitz advised Van Arsdell that his client would execute the requested quitclaim deeds and deeds in lieu of foreclosure if the bankruptcy court approved the transaction. Van Arsdell agreed to prepare the documentation and present it to the court for approval. In view of the imminence of the foreclosures, Van Arsdell requested that Wolkowitz have his clients sign the deeds so· that they could be air expressed to Phoenix, Arizona where they could be recorded immediately upon the court approving the transaction. Wolkow-

itz agreed to this arrangement upon condition that the deeds would not be recorded under any circumstances until an order was made approving the transaction by the bankruptcy judge in Essay's bankruptcy case.

On October 29, 1982, Wolkowitz received quitclaim deeds and deeds in lieu of foreclosure by messenger from Van Arsdell. Wolkowitz caused the deeds to be executed on behalf of Essay on October 29, and on that day redelivered the deeds to Van Arsdell by messenger.

Van Arsdell did not advise Wolkowitz of the formation of the new corporation in Arizona, or that Creative intended to transfer the interest acquired from Essay to a new corporation formed for the purpose of filing a Ch. 11 in Arizona. In fact, had Wolkowitz been aware of the reason for the deeds, and of the intention of Van Arsdell, NewDelman, Garrett and Gertz with respect to the formation of the new corporation, Wolkowitz would not have approved the transaction nor permitted his client to proceed in accordance with Van Arsdell's request. On October 29, 1982, Essay executed quitclaim deeds in Los Angeles conveying Essay's interests in the Highland and Pasadena properties to Creative.

Van Arsdell thereupon caused to be prepared and presented to the bankruptcy judge in Essay's bankruptcy case in Los Angeles, a document which (i) referred to the previous orders obtained by Creative, Duggan and Davies vacating the automatic stay and permitting them to proceed with foreclosure sales on their respective liens; and, (ii) described Creative's offer to pay Essay $3,000 to execute quitclaim deeds and deeds in lieu of foreclosure; and, (iii) proposed that the court make an order authorizing the execution by the debtor of these deeds make exchange for the $3,000 consideration; and (iv) alleged that Creative had sought and found prospective buyers for the properties and believed that if the court approved the execution of the deeds by Essay to Creative, Creative would be able to overcome difficulties relating to title to the properties raised by title companies in

Arizona, and that this would enable Creative to sell the subject properties on terms that would obviate the need for any foreclosure sale.

Van Arsdell appeared in the bankruptcy court in Los Angeles and presented this document to the bankruptcy judge on November 2, 1982. When Van Arsdell presented this legal document and asked the judge to authorize the execution of the deeds by Essay, Van Arsdell was aware of the following facts:

1. That the new corporation had been formed in Arizona;

2. That the new corporation had received a transfer from Creative of all of Creative's right, title and interest in and to its junior liens on the Highland and Pasadena properties, and that this assignment had been executed and recorded in Arizona on October 29, 1982;

3. That Creative had already executed quitclaim deeds of the Highland and Pasadena properties on October 29, 1982, in favor of the newly formed Arizona corporation;

4. That the new corporation had already filed its Ch. 11 proceeding in Arizona;

5. That the purpose of the transaction involving the execution of deeds by Essay to Creative, was to enable Creative to transfer the interest so acquired to the new corporation in Arizona;

6. That no sales or other arrangements had been made with any prospective purchasers of the Highland or Pasadena parcels which would close prior to the foreclosure sales by Duggan and Davies or which would, prior to the date of those sales, produce a consideration sufficient to discharge the senior liens of Duggan and Davies;

7. Finally, Van Arsdell was aware of the entire scenario involving the creation of the new debtor and the transfer to it of interests in property so that it could, by filing a Ch. 11, delay and prevent the enforcement by Duggan and Davies of their senior liens, as authorized by the bankruptcy court in Los Angeles.

Van Arsdell disclosed none of these facts to the court. Of course, notice of the application for approval of the deeds to Creative was not given to attorneys for the senior lien holders. At the time the documents were presented to the judge, Van Arsdell referred to the difficulty his client had had in arranging for disposition of the property because of title problems raised by the title companies in Arizona. These problems could be solved, he said, if his client had title, derived from Essay. At the conclusion of the hearing, the court directed Van Arsdell to include certain provisions concerning the $3,000 in the order to be submitted to the court approving the transaction.

On November 4, 1982, the deeds from Essay to Creative were recorded in Arizona despite the fact that no order authorizing the execution of these deeds was signed by the bankruptcy judge. On the same day, November 4, 1982, the deeds from Creative to the new debtor were recorded in Arizona.

As a result of these transactions, Van Arsdell, Garrett, Gertz and NewDelman succeeded in creating a new corporation in Arizona, which held title to the Pasadena and Highland parcels, and which by filing its Ch. 11 proceeding could urge that the Duggan and Davies foreclosure sales were stayed. The senior lien holders, upon learning of the foregoing transactions and the filing of the Ch. 11 by the new corporation which asserted an ownership interest in the Highland and Pasadena parcels, filed the complaint for relief from the stay which is before this Court for disposition.

## THE ISSUES

The issues are:

1. What is the effect, if any, of the quitclaim deeds and deeds in lieu of foreclosure executed by Essay to Creative? Did Creative, by reason of these deeds, acquire a fee interest in the Pasadena or Highland parcels which it could in turn convey to the debtor?

2. Was the Arizona Ch. 11 proceeding filed in good faith?

2. 11 U.S.C. § 549(a).

## DISCUSSION

### a. The Deeds

■ The facts and circumstances described in the preceding portions of this opinion disclose a unity of interest and a concert of action by the principals and attorneys for Creative and Highland which justifies analyzing their rights, duties and liabilities as against the senior encumbrancers as if Creative and Highland were a single entity.

No court order was ever presented to or signed by the bankruptcy judge approving the execution and delivery of the deeds from Essay to Creative.

■ At the minimum, the deed transactions constitute post petition transfers of property of Essay's bankruptcy estate without an authorization by the court. Under Section 549(a)[2], these transactions may be avoided. While Section 549(a) speaks of avoidance by "the trustee", this court has little difficulty in concluding that under the circumstances disclosed in this case, a court of equity has the power to declare the deeds a nullity. Moreover, the recordation of these deeds, in the absence of such an order, was a direct violation of the express representations made by Van Arsdell to Wolkowitz in order to procure execution and delivery of the deeds.

■ The conclusion is inescapable that the deeds were procured through deceit, fraud, and deception practiced by Van Arsdell on the attorney for Essay, and on the bankruptcy judge. No useful purpose will be served by an extended discussion of the validity of deeds procured in this manner. Neither Creative, nor Highland, are bona fide purchasers in good faith, nor can any equities be urged to support the validity of deeds procured under such circumstances. The conduct of Van Arsdell in his negotiations with Wolkowitz, and in his dealings with the bankruptcy judge in Los Angeles require no further discussion. These matters are best left to agencies charged with

the responsibility of supervising the conduct of members of the bar. Accordingly, neither Creative nor the new corporation in Arizona acquired any legal or equitable interest of any kind or character whatsoever from the deeds by Essay to Creative.

■ The debtor, of course, asserts a beneficial interest in and to Creative's junior encumbrances against the Highland and Pasadena properties. Its interest as a junior lienor may be extinguished by foreclosure sales of the senior encumbrances. Accordingly, the new corporate debtor argues that the filing of its Ch. 11 invoked the automatic stay to prevent action by senior lien holders against the Mariposa and Pasadena properties owned by Essay, to the extent that such foreclosure proceedings would destroy interests of the new corporation in the junior encumbrances. This issue, while an intriguing one, need not be decided in this case. The manifest bad faith of the debtor in instituting the Ch. 11 case is ample grounds to vacate the automatic stay for cause under Section 362(d)(1). Accordingly, no discussion of the effect of the stay on the rights of the senior holder is necessary.

b. *The Good Faith Issue*

Good faith of the debtor in filing a Ch. 11 case has been considered in a number of cases in connection with the transfer of assets to the debtor immediately prior to filing the bankruptcy proceeding. In some cases the debtor is an individual; in others a partnership or corporation newly formed or lately revitalized for the purpose of receiving the transfer of assets and filing the proceeding. These cases, having in common circumstances sometimes described as the "new debtor syndrome", have examined good faith in this context[3] and identified the following as relevant to the inquiry:

1. A new entity was formed for the purpose of filing a case under the bankruptcy statute.

2. The only assets transferred to the debtor were in imminent and substantial danger of loss by foreclosure sale.

3. The only significant creditors were the creditors seeking foreclosure.

4. The filing of the case was not precipitated by nor related to other creditor pressure.

5. There were substantially no unsecured creditors.

6. The debtor had no employees except those in control of its operation.

7. The debtor had no cash flow of substance or any other means to service the encumbrances on its property.

8. The debtor neither conducted nor engaged in any business activities of significance since its formation except to resist foreclosure and file the bankruptcy case.

■ Analysis of these cases makes it difficult to avoid the following conclusions:

(i) Certain recognizable facts and circumstances may be characterized as "badges of bad faith".

(ii) When confronted with "badges of bad faith" courts will scrutinize the conduct of the debtor to determine whether the filing of the petition constituted an abuse or misuse of bankruptcy jurisdiction.

(iii) The test of the debtor's good faith is not whether a transfer of property and/or a change of entity occurred on the eve of filing; timing of the change and/or transfer is not controlling. The question is whether any substantive or procedural rights of creditors available prior to transfer have been altered or eroded by the

---

3. *In re Victory Construction Co., Inc.,* 9 B.R. 549 (Bkrtcy.1981) (Ordin); *In re Zed, Inc.,* 20 B.R. 462 (Bkrtcy.1982) (Brown); *In re Allison Corp.,* 9 B.R. 827 (Bkrtcy.1981) (Pyle); *In re Dutch Flat Inv. Co.,* 6 B.R. 470 (Bkrtcy.1980) (Wolfe); *In re Eden Associates,* 13 B.R. 578 (Bkrtcy.1981) (Lifland); *Matter of 299 Jack-Hemp Associates,* 20 B.R. 412 (Bkrtcy.1982) (Babitt); *In re Lotus Investments, Inc.,* 16 B.R. 592 (Bkrtcy.1981) (Weaver); *Matter of Nancant, Inc.,* 8 B.R. 1005 (Bkrtcy.1981) (Glennon); *In re G–2 Rlty. Trust,* 6 B.R. 549 (Bkrtcy.1980) (Lawless); *Matter of Northwest Rec. Activities, Inc.,* 4 B.R. 36 (Bkrtcy.1980) (Norton); *Spenard Ventures, Inc.,* 18 B.R. 164, 8 B.C.D. 1032 (Bkrtcy.1982) (Williams); *In re Beach Club,* 22 B.R. 597 (Bkrtcy.1982) (Rainville).

transfer and subsequent filing. It is the detriment to creditors, not the advantage to prior owners which has the greater relevance in determining whether creditors are fraudulently hindered or delayed by the filing.[4]

The inquiry often focuses on the following:

(1) Would the secured creditor have had any greater potential for foreclosure or realization on its claim if the petition had been filed by the transferor?

(2) Did the transfer to the new entity improve the debtor's ability to protect or remove collateral from the secured creditor's reach, or alter the secured creditor's rights in the collateral?

(3) Did the transaction improve, or at any rate not decrease, the debtor's potential to provide adequate protection to the secured creditor's interest in the collateral?

(4) Was the transaction motivated by an intent and desire to avoid submitting the actual entities in interest to the jurisdiction of the court, together with other assets not transferred to the debtor? Is this an "asset-culled entity"?

(5) Was the petition filed solely for the purpose of thwarting and frustrating secured creditors in the enforcement of lien rights under circumstances which amount to "malicious", "frivolous", or "unwarranted" delay?[5]

The circumstances surrounding the formation of the new debtor corporation in Arizona, its acquisition of interests in the Highland and Pasadena properties, and the filing of its Ch. 11, track the elements of the "new debtor syndrome" cases in a manner which is almost uncanny. The "badges of bad faith" stand forth in broad outline. Resort to bankruptcy process to attack the substantive and procedural rights of the senior lien holders through use of the "new debtor syndrome" has never been evidenced more clearly. The sole objective of Garrett, Gertz, Van Arsdell and NewDelman was to hinder and delay the senior lien holders in enforcing their rights to proceed against the collateral. Highland is indeed an "asset-culled entity". Its petition was filed solely for the purpose of thwarting and frustrating the senior lien holders. The delay accomplished thereby must be deemed to be "malicious", "frivolous", and "unwarranted".

The debtor argues that its conduct is warranted and supported by *Beach Club.*[6] That decision approved the use of bankruptcy process to isolate a troubled piece of property by creating a new entity to which the property was conveyed for the purpose of instituting a Ch. 11. The transferor did not transfer other more valuable properties but retained them and thereby shielded them from the jurisdiction of the bankruptcy court. However, the court expressly found that the interests of the secured creditor were neither altered, eroded, nor injured. While these findings may justify the result reached by the court, neither the facts, circumstances nor the decision in *Beach Club* justify the results sought to be achieved by Garrett, Gertz, Van Arsdell and NewDelman in the case at bar.

For the reasons hereinabove set forth, the automatic stay resulting from the filing of Highland's Ch. 11 is vacated and the senior lien holders (herein described as Duggan and Davies) are authorized to proceed with the enforcement of their lien rights.

This memorandum of opinion shall constitute findings of fact and conclusions of law, as provided in Rule 752(a).

---

4. *Matter of Northwest Rec. Activities, Inc.,* 4 B.R. 36 (Bkrtcy.1980) (Norton); *Spenard Ventures, Inc.,* 18 B.R. 164, 8 B.C.D. 1032 (Bkrtcy. 1982) (Williams); *In re Beach Club,* 22 B.R. 597 (Bkrtcy.1982) (Rainville).

5. *Matter of Northwest Rec. Activities, Inc.,* 4 B.R. 36 (Bkrtcy.1980) (Norton); *In re Allison Corp.,* 9 B.R. 827 (Bkrtcy.1981) (Pyle).

6. *In re Beach Club,* 22 B.R. 597 (Bkrtcy.1982) (Rainville).