### In re CORPORATION DEJA VU, Debtor.

**GLASSMANOR APARTMENTS LIMITED PARTNERSHIP, Movant,**

**v.**

**CORPORATION DEJA VU, Respondent.**

**Bankruptcy No. 83–A–1292.
Motion No. 83–M–0064A.**

United States Bankruptcy Court, D. Maryland.

Oct. 14, 1983.

Robert Ostrom, Upper Marlboro, Md., for movant.

James Greenan, Lanham, Md., for debtor/respondent.

## MEMORANDUM OF DECISION

PAUL MANNES, Bankruptcy Judge.

This matter was before the court on September 13, 1983, in Rockville and September 16, 1983, in Baltimore upon the Motion for Relief from the Automatic Stay of 11 U.S.C. § 362 filed by the Glassmanor Apartments Limited Partnership against Corporation Deja Vu. The court was assisted greatly by the briefs filed by counsel for both parties that clearly and concisely defined the issues presented.

The debtor, Corporation Deja Vu (sometimes "Deja Vu"), was newly formed expressly for the purpose of receiving an interest in a large apartment project and filing a Chapter 11 petition almost simultaneously with the receipt of the deed. Movant had scheduled a foreclosure sale for the day following the filing. Deja Vu has no bank account, no employees, no bills, and has never had any funds or any other property. Its sole asset is whatever interest it had in the property in foreclosure. Deja Vu maintained no place of business, conducted no business activity, and had no means of its own to offer adequate protection. It had no equity in the real estate.

The movant made a substantial effort in the course of the proceeding and in its memorandum to characterize the respondent's Chapter 11 filing as one filed in bad faith which should be dismissed for that reason. *Cf. In re Northeast Corporation,* 519 F.2d 1360, 1363 (4th Cir.1975); *In re Madison Hotel Associates,* 29 B.R. 1003, 1009–10 (W.D.Wis.1983). That issue is not before the court in a § 362 hearing. A good faith inquiry normally comes before the court at the time of confirmation, 11 U.S.C. § 1129(a)(3), or upon a motion to dismiss or convert under 11 U.S.C. § 1107. *See generally, In re Mogul,* 17 B.R. 680 (Bkrtcy.S.D.Fla.1982); *In re FJD, Inc.,* 24 B.R. 138 (Bkrtcy.Nev.1982). What this court is being asked to do is to determine at a § 362 hearing issues that the Code indicates should be resolved at an entirely different hearing with notice to all creditors. The court declines to handle this case upon a motion to dismiss. Respondent has had no notice of any such hearing. Dismissal under 11 U.S.C. § 1112(b) is permitted only after notice and hearing. *In re Warner,* 30 B.R. 528, 10 B.C.D. 1070 (Bkrtcy.App. 9th Cir.1983).

The court will deal with this case as an ordinary application for relief from the automatic stay. Section 362 of the Bankruptcy Code provides as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Courts have concluded that a lack of good faith or misconduct in filing a petition under Chapter 11 entitles a secured creditor to relief from the stay of § 362. *In re Victory*

*Construction Co., Inc.,* 9 B.R. 549, 558–60 (Bkrtcy.C.D.Cal.1981); *Farmers & Merchants Bank & Trust Co. of Watertown v. Trail West, Inc.,* 28 B.R. 389, 394 (D.S.D. 1983); *In re Zed, Inc.,* 20 B.R. 462, 464 (Bkrtcy.N.D.Cal.1982); *In re Lotus Investments, Inc.,* 16 B.R. 592, 595–96 (Bkrtcy.S. D.Fla.1981).

The characters and property that make up this scenario are as follows:

The property, known as the Glassmanor Apartments, is a 33.2 acre project consisting of 36 buildings containing 771 garden apartment units. It is located in the Eastover section of Prince George's County, Maryland, which is almost immediately adjacent to Southeast Washington, D.C. The property lies within the Capital Beltway close to an interchange and is probably no more than 15 minutes from downtown Washington and a similar distance from the National Airport.

The court recalls that the property was built in the years immediately following World War II and provided convenient, much needed rental housing for the rapidly expanding population of the nation's capital. In recent years, the property has fallen onto hard times and has become increasingly run down. The evidence indicated that the Prince George's County Housing Authority finally closed the property in May, 1983, ordered the last 100 tenants to vacate and required that the property be boarded up.

Despite the depressed condition of the property, the project has great charm to certain developers. The property is tailor-made for a rental housing rehabilitation loan with funding and mortgage insurance available through the Federal Housing Administration of the U.S. Department of Housing and Urban Development. While this matter was not fully developed at trial, a developer could likely obtain a mortgage of $14,500,000.00, which would produce substantial profits through the rehabilitation and resale of the property as a tax shelter. A § 221(d)(4) HUD program is contemplated which would provide for a limited dividend partnership.

DRAMATIS PERSONAE—

*Wisconsin Real Estate Investment Trust ("WREIT").* WREIT is a real estate investment trust operating out of Chicago, Illinois. The trust acquired the Glassmanor project in December, 1969. At the time of the material transactions before the court, the principal incumbrance upon the property was a lien secured by a first deed of trust, the principal balance of which was $3,459,153.00 on July 25, 1983. In 1981, for one reason or another, WREIT became disenchanted with the subject property and commenced attempts to dispose of the property to various individuals and entities. From the beginning, the prospective purchasers' interest in the property depended upon a housing development program involving government guaranteed loans. WREIT entered into contracts with at least one of these parties, as a result of which WREIT placed a deed to the property in escrow. This original purchasing entity was known as Salisbury Heights, and the court understands that individuals known as the Cantor brothers were the principals of this group. At some time after the contract on October 1, 1978, between WREIT and Salisbury Heights Associates Ltd. Partnership, Salisbury Heights is said to have conveyed its interest to Michael Feld. Various individuals such as Michael Feld, Daniel Goodman, and Concord Mortgage Company made a number of attempts to move the project so as to obtain an FHA commitment to insure a mortgage. Due to the inability of any of these would-be purchasers to obtain "site control", none of them were successful in obtaining a commitment from FHA.

*Chase Manhattan Bank, N.A. ("Chase").* Chase, as substitute trustee or agent for 17 various retirement trusts, was the holder of the note secured by the first deed of trust. The note went into default in July of 1981, and Chase did not seek to foreclose its interest. Foreclosure would have obviously involved having to buy in the property. The court assumes that Chase had no interest in attempting to salvage its investment through development of the property.

*Glassmanor Apartments Limited Partnership ("Partnership").* This Partnership, consisting of at least Wayne Bowie and David R. Marshall, Jr., as general partners, was formed to gain control of the Glassmanor Apartments. To that end, the Partnership acquired the note secured by the first deed of trust from Chase for the price of $1,110,001.00. This transaction was completed in late April, 1983. The Partnership then commenced to clear the land title by foreclosing on the deed of trust. This process began with the mailing of the required registered letters to WREIT. Matters moved forward, and a public sale was set for August 19, 1983. The Partnership received actual notice of the Chapter 11 filing by Deja Vu prior to the foreclosure sale on August 19, 1983. Nevertheless, Glassmanor's substitute trustee went forward with the sale and sold the property to Glassmanor Apartments Limited Partnership, the noteholder, for the sum of $3,450,000.00. An associate of Glassmanor in this project is Eugene Ford, the president of Mid-City Financial Corp. Mr. Ford had been associated previously with Eastover Park Associates and Michael Feld, but now is engaged in a joint effort with the principals of Glassmanor.

*Corporation Deja Vu ("Deja Vu").* This corporation was formed on August 17, 1983, by Erlene Twining. Ms. Twining controls the corporation and owns all of the stock. The day following its formation, Deja Vu entered into and concluded an agreement of sale with WREIT to buy a quitclaim deed for the project for $360,000.00. Of this sum, $10,000.00 was cash, $20,000.00 was a promissory note, and $330,000.00 was a nonrecourse promissory note secured by a second deed of trust. Although Deja Vu was obligated to pay all costs incurred in connection with the transaction, the corporation had not recorded the deed or deed of trust at the time of the hearing. Deja Vu was unwilling to risk the $70,000.00 necessary to record these instruments in order to pursue this venture.

The corporation was formed by Ms. Twining for the sole purpose of assisting her to acquire control of the Glassmanor property.

The first step required to obtain control of the property was to file the Chapter 11 proceeding and forestall the foreclosure. Deja Vu was incorporated with the intent to act as the nominal petitioner. A would-be associate of Ms. Twining in this endeavor is the Bush Construction Corporation, an extremely experienced corporation with the capacity to complete the entire project competently. No contractual arrangement exists between Bush and Ms. Twining. Bush had previously reviewed this project in March, 1982, and January, 1983, when Mr. Feld was involved, and the corporation appears willing to sit down and work out a deal with Ms. Twining concerning the future participation of each in this entity.

Deja Vu has no employees, no assets, no bank account, no capital, no office, no income, no books or records, and no reason for existence other than to act as a conduit for the title to the Glassmanor real property. Because it is not an ongoing business, Deja Vu possesses no good will.

Deja Vu had no creditors when it was incorporated, and it was incorporated with the intent of filing a Chapter 11 proceeding. By this maneuver, Ms. Twining hoped to forestall the foreclosure when the corporation received the deed to the property the next day.

To recapitulate the events concerning the Glassmanor Apartments, the evidence indicates that several different developers attempted to work out an arrangement with the Wisconsin Real Estate Investment Trust to gain control of the site. The only result that these negotiations produced was a clouding of the title in the eyes of some. At about the same time Glassmanor Partnership acquired the Chase mortgage and the county authorities closed the property, WREIT lost all interest in the property. Corporation Deja Vu was formed at 2:50 p.m. on August 17, 1983. At or about 4:00 p.m. on Day 2 of the life of Deja Vu, three remarkable things happened. First, it concluded a deal to buy the project for $10,-000.00 cash and $350,000.00 in notes; second, Deja Vu received a quitclaim deed

for the property from WREIT, and third, Deja Vu filed its petition for relief under Chapter 11. On Day 3, the foreclosure took place. Corporation Deja Vu has never recorded the deed or the deed of trust note. Deja Vu offered no reasonable explanation regarding why the deed was not recorded. The court concludes that Twining simply did not want to risk more than the $10,-000.00 down payment she gave to WREIT and that Ms. Twining awaits the outcome of this case to decide if she should record.

The court finds that the value of the subject property is $3,765,000.00 as evaluated by Frederick B. Lauterbach and that debtor has no equity in the property. As of the time of trial, the following debts encumbered the property:

| | |
|---|---|
| Principal balance under Glassmanor loan | $3,459,153.00 |
| Interest to September 16, 1983 | 16,756.00 |
| WREIT second trust | 330,000.00 |
| Prince George's County lien | 10,800.00 |
| Washington Suburban Sanitary Commission | 21,000.00 |
| Mechanic's liens | 16,000.00 |
| Sears, Roebuck | 7,500.00 |
| | $3,861,209.00 |

Given the absence of equity in the property, the court must next determine whether the property is required for an effective reorganization. The court finds that it is not. Corporation Deja Vu is not the developer of this property. What Deja Vu seeks to do is to enter into a deal with a reputable and experienced builder such as Bush Construction Corporation, obtain financing, and syndicate the property. The *Random House College Dictionary* (1980), defines reorganization as follows:

1. the act or process of reorganizing.
2. the state of being reorganized.
3. *Finance.* a thorough or drastic reconstruction of a business corporation.

Whatever Deja Vu is experiencing, it is certainly not a reorganization. Deja Vu is a new corporate shell with neither debts nor capital. The corporation exists only as a device to gain control of the property while Ms. Twining seeks to sell the development package. Therefore, Deja Vu is not entitled to the protection of the automatic stay.

What this case boils down to is two competing camps seeking to gain control of the Glassmanor project. Corporation Deja Vu acquired what standing it has by purchasing whatever property interest WREIT had, while Deja Vu was well aware of the pending foreclosure. For that reason, WREIT made no warranty of any kind and undertook no expense. The other competing developer, rather than trifle with a title that appeared to be flawed, went to the Chase Manhattan Bank and purchased the $3,500,-000.00 mortgage for $1,110,001.00. Chase had no interest in taking over the project and in realizing upon the security found to be worth more than $3,000,000.00.

The court finds that this petition for reorganization was filed solely to obtain the benefit of the § 362 stay. No reorganization or rehabilitation is possible for Corporation Deja Vu. Deja Vu clearly cannot develop the Glassmanor project by itself, and its principal does not intend to proceed in that manner. The corporation is without a future and without a history. It exists only to forestall foreclosure and to buy time to enable its principal to put together a package to broker or syndicate.

In the leading case of *In re Victory Construction Co., Inc.,* 9 B.R. 549, 7 B.C.D. 257, 3 C.B.C.2d 655 (Bkrtcy.C.D.Cal.1981), Judge Ordin wrote about a remarkably similar transaction in which the debtor's principal took a $5,000.00 "crap shoot." The principal obtained a quitclaim deed rather than paying off the lienholders and placed the property in the name of a reactivated corporation. The court concluded its research by pointing out:

3. The purchase of a quitclaim to fully encumbered property on the eve of foreclosure, with intent to use Chapter 11 to delay the secured creditors in enforcement of their rights, is inconsistent with the purpose, spirit, and intent of the statute, under the facts and circumstances here presented.

4. The analysis and principles expressed by the courts called upon to deal

850

with the good faith issue in cases relating to the "new debtor syndrome" fully support the determination that the debtor did not act in good faith in filing this Chapter 11 petition.

5. There is neither a going business nor going concern value to preserve or protect in this case, and the preservation of this speculative venture should not be undertaken at the expense of secured creditors.

6. The debtor purchased its way into court. Justice, equity and public policy prohibit this.

9 B.R. at 564–65.

" 'Good faith' implies an honest intent and genuine desire on the part of the petitioner to use the statutory process to effect a plan of reorganization and not merely as a device to serve some sininster or unworth purpose." *In re Metropolitan Realty Corporation,* 433 F.2d 676, 678 (5th Cir.1970); *accord, In re Business Finance Corporation,* 451 F.2d 829, 834 (3d Cir.1971). In order to establish the good faith requisite to confirmation, the petitioning debtor must show that there is a "reasonable probability or fair assurance of successful reorganization." *In re Holi-Penn, Inc.,* 535 F.2d 841, 844 (3d Cir.1976).

The phenomenon of a debtor receiving property and then filing for relief under the Bankruptcy Code is so widespread that it has been called the "new debtor syndrome." This syndrome has been identified in numerous cases. These cases do not suggest that the filing of a Chapter 11 petition to stop foreclosures is, alone, cause to dismiss the petition. Indeed, a debtor often protects its creditors by preventing foreclosure so that the property may be subsequently sold for a higher price that will enable the debtor to pay unsecured claims. The issue is whether there is a real possibility that a bankruptcy case may yield better results for other parties in interest. The only other party in interest here is WREIT, which has abandoned the project. WREIT may not accomplish indirectly what it would not do directly—reorganize the project. *See Duggan infra* at footnote 3.

The court thoroughly described the phenomenon in *Duggan v. Highland-First Ave. Corp.,* 25 B.R. 955 (Bkrtcy.C.D.Cal.1982). Debtor procured deeds to property through deceit. Debtor then filed a Chapter 11 case four days after incorporation. The court brought *Victory Construction* up to date and analysed the eight factors prevalent in what the court termed the "new debtor syndrome" cases:

1. A new entity was formed for the purpose of filing a case under the bankruptcy statute.

2. The only assets transferred to the debtor were in imminent and substantial danger of loss by foreclosure sale.

3. The only significant creditors were the creditors seeking foreclosure.

4. The filing of the case was not precipitated by nor related to other creditor pressure.

5. There were substantially no unsecured creditors.

6. The debtor had no employees except those in control of its operation.

7. The debtor had no cash flow of substance or any other means to service the encumbrances on its property.

8. The debtor neither conducted nor engaged in any business activities of significance since its formation except to resist foreclosure and file the bankruptcy case.

25 B.R. at 961.

All of these factors are present here.

Clearly, the debtor was created for the sole purpose of buying time for its principal to broker the transaction. Reorganization was neither contemplated nor possible. The petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay.

Cause for relief from the stay also lies in the lack of adequate protection for movant's interest. Deja Vu has tendered no adequate protection for its creditor, especially in view of the hazards of vandalism and whether which threaten the abandoned property. Debtor has no funds and must depend upon its partners or successors to

protect the interests of itself and its creditor.

Movant urges that the stay be annulled. What movant seeks is the legitimization of the sale held on August 19, 1983. Otherwise, movant would have to readvertise the property and go through the auction process once again. The imposition of the stay nullified all actions in violation of it. *Kalb v. Fueuerstein,* 308 U.S. 433, 443, 60 S.Ct. 343, 348, 84 L.Ed. 370 (1940). Respondent therefore urges that movant's foreclosure, conducted with knowledge that the stay was in effect, was in contempt of this court and should be punished.

The court finds that while movant knew of the petition, the movant acted reasonably in causing the land title to be searched immediately before the sale. When the search did not reveal the deed out of WREIT, movant went forward. Mere knowledge that Corporation Deja Vu had filed a Chapter 11 petition was not enough; movant also needed to know that Deja Vu had a substantial interest in the property.

The court, having determined that the stay will be lifted, must decide whether to annul the stay at movant's request. Movant seeks to legitimize its action, taken in violation of the stay. Competing interests come into play. The automatic stay is the keystone of bankruptcy practice. The stay of § 362 must not be weakened or trifled with in any respect. The irreparable injury that movant describes is the loss of $700.00 a day in carrying costs. In the meanwhile, movant has apparently been dealing with property as if it owned the property in fee. Repair work is taking place now, and debris is being removed. Movant's claim of irreparable injury is overstated. Movant is merely sustaining an expense of $21,000.00 a month that it would surely recover if someone else repurchased the property at the same price Glassmanor Partnership paid at the auction.

Glassmanor Partnership is now painfully aware of the Bankruptcy Code. The court believes that the Partnership will be unlikely to ignore the § 362 stay in the future. Thus, the court sees no useful purpose in commanding another sale. The stay will be annulled.