**In the Matter of OAKBROOK VILLAGE, INC., Debtor.**

**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF WARNER ROBINS, Movant,**

v.

**OAKBROOK VILLAGE, INC., Respondent.**

**Bankruptcy No. 489–00626.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

June 2, 1989.

Benjamin S. Eichholz, Savannah, Ga., for plaintiff/movant.

Sherwin P. Robin (First Fed.), Savannah, Ga., Frank B. Wilensky, Atlanta, Ga., for defendant/respondent.

## MEMORANDUM AND ORDER ON MOTION TO ANNUL THE STAY, FOR DISMISSAL AND FOR THE IMPOSITION OF SANCTIONS

LAMAR W. DAVIS, Jr., Chief Judge.

The above-captioned Motion by First Federal Savings and Loan Association of Warner Robins was the subject of a lengthy evidentiary hearing on May 22, 1989. Based on the evidence and consideration of applicable authorities I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1) Debtor's Chapter 11 case was filed in this Court on May 2, 1989, at 8:54 a.m. Later the same day during legal hours of sale the Movant, holder of a first deed to secure debt, consummated a non-judicial foreclosure under Georgia Law by offering

**840**

and selling the Debtor's principal asset, an apartment complex, to the highest and best bidder for a sum in excess of 1.2 million dollars. At the time the foreclosure sale was conducted on the steps of the Chatham County Courthouse, the Movant had no actual knowledge of the pendency of this Chapter 11 case. The Movant/Creditor was the successful bidder at the public sale. Subsequent to the public sale, however, the Movant became aware of the pendency of this case and took no further steps to record a deed of foreclosure. Instead, the Motion which is before the Court was filed seeking to have the case dismissed, to annul the stay so as to validate the foreclosure, and to impose sanctions on Debtor's principal and Debtor's counsel for the filing of this Chapter 11 which is alleged to have been brought in bad faith.

2) Debtor became the owner of Kingswood Apartments on September 26, 1983 when it purchased the 58 unit apartment complex from John Michael Burroughs subject to the outstanding deed to secure debt held by First Federal. (Exhibit M–3). The Certificate of Assumption executed by Oakbrook Village, Inc., contained the following language: "The Purchaser [Oakbrook] hereby convenants and agrees that it shall discharge the indebtedness evidenced by said Security Deeds and the obligations of said Security Deeds according to the tenor thereof . . .". Said instrument further contains the following language:

"EACH OF THE PARTIES OF THIS CONTRACT ACKNOWLEDGES AND UNDERSTANDS THAT THE LOANS PRESENTLY OUTSTANDING ARE NONASSUMABLE WITHOUT THE PERMISSION OF THE LENDER AND FURTHER ARE DUE AND PAYABLE IN FULL ON OCTOBER 1, 1988." (Emphasis original)

The Debtor is a closely held corporation wholely owned by David C. Howard who also is Debtor's president. Oakbrook paid 1.7 million dollars for the Kingswood Apartment complex which Howard agreed to purchase on or about September 13, 1988, the first day he visited the subject property. Oakbrook acting through Mr. Howard put up no cash in order to acquire title to the apartment complex. Rather the corporation took title to the real estate subject to three outstanding mortgages and Mr. Howard executed his personal guarantee of the third mortgage in an amount of some $300,000. Oakbrook also assigned part of an interest it had in a mortgage payable to Oakbrook from a third party. Mr. Howard testified, however, that the real estate secured by this mortgage has been foreclosed upon by the holder of a prior mortgage instrument and thus, apparently, the mortgage in favor of Oakbrook which was partially assigned to Mr. Burroughs is valueless. At the time Oakbrook, acting through Mr. Howard, purchased the apartment complex Howard also knew that there was a so called "due on sale clause" in the note and deed to secure debt which had the effect of placing the mortgage to First Federal in a default status in the event of a transfer of title without First Federal's knowledge and consent. First Federal did not consent to the transfer between Burroughs and Oakbrook.

3) Notwithstanding the fact that the entire note became due and payable on October 1, 1988, the Movant accepted monthly payments in an amount equal to the monthly payments previously due and payable under the note during the months of October and November of 1988. However, no payment was tendered after November of 1988 to First Federal.

4) In January, 1989, First Federal caused to be sent to the Debtor the notice required under Georgia Law of its intention to foreclose the real estate by non-judicial foreclosure. The foreclosure sale was scheduled for February 7, 1989 in Chatham County, Georgia, the location of the real estate. On February 6, 1989, however, the day prior to the scheduled foreclosure, Oakbrook Village, Inc., filed a Chapter 11 proceeding in the Middle District of Florida, Tampa Division, the residence of Mr. Howard.

5) On March 3, 1989 and March 10, 1989 the Court entered orders restricting the Debtor's use of cash collateral, which cash collateral arose by virtue of rents received

from rental of the units in the 58 unit apartment complex. (Exhibits M–8 and M–9). Subsequently, on March 27, 1989 a hearing was conducted before the Honorable Thomas E. Baynes, Jr., Bankruptcy Judge in that District. At the conclusion of the hearing, the Court announced: "That the Debtor personified the new debtor syndrome ... that the filing of the petition is in that context in bad faith. Therefore, the motion to dismiss *shall* be granted. The motion to lift the stay *shall* be granted." Transcript at 93 (emphasis added). The Court requested Mr. Tatelbaum, the Movant's counsel, to submit orders to that effect.

6) Immediately upon the conclusion of the Court's oral findings, Mr. Howard, allegedly on advice of counsel, took approximately $10,000 in funds which were being held in a First Union debtor-in-possession account pursuant to the Court's previous cash collateral orders and converted them to his own use, by transferring them to another closely held corporation, Security International, Inc. See Exhibits M–10, M–11 and M–12. These, together with the admission of Mr. Howard, demonstrate clearly that immediately upon the Court's verbal findings that the case would be dismissed, Mr. Howard directed Pamela Helmly, Oakbrook's resident manager, to draw checks in the amount of $9,700.00 from the First Union account payable to Veronica Micke and to take $1,175.00 in cash out of the office drawer. The contemporaneous notes taken by Veronica Micke of the instructions from Mr. Howard indicate that on March 27, 1989 she was instructed as follows:

"Tommorrow get money out: $5,000.00 one branch cash $4,000.00 one branch out. Put cash (from office drawer) in too! No records—of what happened to money out of First Union. No cashiers checks!"

(Exhibits M–17 and M–18).

Thereafter, Ms. Micke deposited the cash in a new nondebtor-in-possession account at Trust Company Bank of Savannah and issued a check payable to Security International, Inc., on April 3, 1989 in the amount of $10,000.00.

7) On April 4, 1989, Judge Baynes entered written orders in conformity with his verbal findings from the March 27th hearing. (Exhibits M–1 and M–2). In the "Order Modifying Stay" the Court ordered the Debtor to turnover all the funds being held pursuant to the March 10, 1989, cash collateral order, to the secured creditor, First Federal. (Exhibit M–2).

8) Subsequent to the dismissal of the Tampa case, First Federal again initiated foreclosure proceedings under Georgia Law and gave notice of that fact to the Debtor during the month of April, 1989. The foreclosure was scheduled for May 2, 1989 and as previously indicated was conducted on that date. During the same time, First Federal brought an action in the Superior Court of Chatham County, Georgia, to have a receiver appointed under state law to take over the operation, control and management of the apartment complex and to insure the proper utilization of the rents which were being paid by the tenants. Diversified Management Group, Inc., was duly appointed receiver by order of the Superior Court dated April 12, 1989. The apartment complex which secured the loan to First Federal is also subject to a second and a third mortgage in the aggregate amount of approximately $500,000. The second priority deed to secure debt is held by Coastal Developers, Inc., which was represented at the hearing and which supported the Debtor's effort to have the case left pending for possible rehabilitation.

9) David Howard, as previously indicated, is the president and sole shareholder of the Debtor corporation. He also is president and sole shareholder of Security International, Inc., a real estate investment firm. His status as the sole shareholder of Oakbrook is, however, subject to an agreement verbally entered into on or about April 19th to sell two-thirds of the stock to Martin Bradley, a local businessman. This agreement was memorialized by written contract dated May 11, 1989, which grants Bramar Associates, a closely held corporation whose sole shareholder is Martin J. Bradley, an option to acquire two-thirds of

the stock in the Debtor corporation in exchange for Bradley's conveyance of a twenty-five percent interest in a partnership which owns a duplex apartment unit on Waldburg Street in Savannah. (Exhibit M–19). The Waldburg Street property is owned by a general partnership which includes Benjamin Eichholz (the Debtor's attorney), Martin Bradley and Mr. Bell.

It appeared from the testimony, however, that the conveyance of the partnership interest to Oakbrook has not actually been executed. Martin Bradley was granted, until April 19, 1990, the right to exercise the option and to have "the controlling votes on the board of directors of said corporation". Bramar, acting through Bradley, commits itself in the option agreement to "make its best efforts to reinstate the presently delinquent first mortgage loan a (sic) favor of First Federal Savings *Loan Association of Warner Robins*". The option agreement further recognizes the potential for the filing of a Chapter 11 bankruptcy case by Oakbrook and Bramar, through Bradley, "agrees to utilize its best efforts to insure the continuity of the corporation's business". The agreement does not specifically commit Bramar or Bradley, however, to any particular level of financial commitment on behalf of the Debtor corporation. (Exhibit M–19).

The option further sets forth that the membership of the board of directors of the Debtor consists of David Howard, Martin Bradley and Norma Bradley.

10) Mr. Howard, acting through Oakbrook and Security International, has invested in thirty to forty properties over the past several years, none of which have ever been involved in a proceeding under the bankruptcy laws of the United States. Apparently Mr. Howard advertises widely for distressed properties which he seeks to purchase, rehabilitate and sell at a profit.

11) When the Chapter 11 case was filed in the Middle District of Florida the petition and schedules revealed no unsecured creditors in the case except Mr. Howard himself. During the pendency of the prior case, all decisions to pay bills or not to pay bills were made by Mr. Howard. Mr. Howard authorized and directed that certain of his personal bills and obligations be paid by Oakbrook either directly or by transfers to Security International which items such as house payments, car payments and other matters which were of a purely personal nature. Mr. Howard dismisses such payment of personal obligations by use of corporate funds as merely the "normal way of doing business" in a close corporation. Also during the pendency of that case Mr. Howard caused $10,000 in "Imprest Funds" representing tenants' security deposits to be transferred to Oakbrook and subsequently used them for his personal benefit (Exhibit M–13). Mr. Howard knew that numerous unsecured vendors had not been paid. Notwithstanding Mr. Howard's knowledge, the only unsecured creditor he listed in the first case was himself.

In a similar fashion, on May 4, 1989, Mr. Howard filed a sworn statement in this case under penalty of perjury "that there are no unsecured creditors in this case." (Exhibits M–15 and M–16). Mr. Howard filed this statement knowing that Oakbrook owed unsecured obligations to approximately twelve creditors totalling in excess of $7,000.00.

12) Oakbrook has never obtained a Federal Tax Identification Number and no State or Federal Tax Return has ever been filed by or on behalf of Oakbrook even though it has been in existence since sometime in 1985. Oakbrook has never issued a W–2 Form to Mr. Howard showing the income which he personally has derived from Oakbrook as president and an employee of Oakbrook.

13) Since the appointment of the receiver the occupancy rate in the apartments has improved and deferred maintenance and repairs have been undertaken, all of which had been neglected during the time Mr. Howard, through Oakbrook, was in charge of the management of the property. It is estimated, however, that some $50,000 is needed in immediate repairs in order to maximize the desirability of the apartments so that full occupancy can be achieved during the peak leasing season, which occurs during the early summer in this area.

14) Subsequent to the acquisition of the apartment complex by Oakbrook and prior to the filing of the case in the Middle District of Florida, Mr. Howard had undertaken active efforts to resell the property. At one point he succeeded in obtaining a contract to sell the real estate to SJT, Inc. at a price which would pay off the first, second and third mortgages and yield a $200,000 profit to Oakbrook. That contract was to close prior to the end of 1988 and in fact the principals of SJT, Inc., and Mr. Howard met in an attorney's office and executed closing documents near the end of the calendar year 1988. Unfortunately, the lender which had allegedly made a commitment to fund the purchase by SJT did not in fact provide the necessary funding in order to consummate the transaction. As a result the sale was never consummated. There was no evidence that either Oakbrook or Mr. Howard had ever sought to bring an action for specific performance or for damages against SJT, Inc., or the purported lender for the loss allegedly sustained by the failure of this transaction to close.

15) After filing the previous bankruptcy case, Mr. Howard continued in his efforts to sell the property and on April 3, 1989 a contract to sell the apartment complex for $3,050,000 was entered with Lovick M. Shippey (Exhibit R-1). That contract was contingent on Mr. Shippey's ability to obtain a commitment from Citicorp to make 58 individual fee simple loans at·an interest rate of 7.75% with interest only payments for one year and thereafter for principal and interest to amortize over a thirty year period with gradual increases in the interest rate. Apparently Mr. Shippey's intention was to convert the apartment complex into condominium units and the commitment to make 58 individual loans would have facilitated his ability to market those condominiums.

16) Although that contract did not expire for a period of thirty days after the acceptance date which was April 5, 1989, Mr. Howard testified that it had already become clear by the middle of April that Citicorp had decided not to provide such financing because Mr. Shippey was not sufficiently strong financially to obtain such a commitment. Mr. Shippey apparently attempted to generate interest in third parties entering the deal but was unsuccessful in doing so. Mr. Howard's testimony was and I, therefore, conclude that as of April 19, 1989, when the agreement was reached between Oakbrook and Bramar Associates, Inc., that there remained no prospect that the Shippey contract would close and that Mr. Howard was well aware of that fact.

17) The property has been listed with David Byck Real Estate, through Margie Gordon as broker, at an asking price of 1.8 million dollars with an agreed upon commission to the realtor of $100,000. That listing contract was executed after the dismissal of the case pending in the Middle District of Florida.

18) Mr. Howard informed his present counsel, Benjamin S. Eichholz, that there had been a previous Chapter 11 filing in Florida and that it had been dismissed by the Court there on grounds of lack of good faith. He also gave Mr. Eichholz the name of his Florida bankruptcy counsel but did not supply him with copies of his schedules or the petition in Florida. Mr. Eichholz did not confer with prior counsel but decided to file the subsequent Chapter 11, believing that given a brief period of time to sell the real estate, Debtor can pay all debts.

19) As of the date of filing, May 2, 1989, Debtor had no agreement with any of his lenders to refinance the indebtedness and did not have in force any contract for the sale of property which was still capable of closing according to its terms. In addition, his agreement with Bramar Associates and Mr. Bradley, although not reduced to writing until after May 2nd, had been agreed to.

20) Margie Gordon, the listing broker, stated that it was "not inconceivable" to her that the property could be under contract in a period of thirty days with approximately thirty additional days needed to consummate the closing. However, she does not have a contract or any firm prospect pending at this stage. She estimated a "quick sale" value of the property as

being between 1.5 and 1.75 million dollars. The property has been on the market for a period of two years and has been the subject of four separate sales contracts none of which have closed. The "quick sale" value would not exceed the outstanding debt on all three mortgages which amount to $1.7 million.

The Movant argues that a Chapter 11 filing on the same day as a scheduled foreclosure of real estate immediately upon the heels of a dismissal of the Debtor's prior Chapter 11 case on bad faith grounds by another Bankruptcy Court is *per se* evidence of bad faith and demands a dismissal of this case, annulment of the stay and the imposition of sanctions under Bankruptcy Rule 9011. Alternatively, the Movant argues that there are no circumstances which changed between the April 4th dismissal of the prior bankruptcy proceeding in the Middle District of Florida and the refiling on May 2nd in this Court which would justify a finding that this separate case is being prosecuted by the Debtor in good faith.

Debtor's position is that both the case filed in the Middle District of Florida and the within proceeding were filed and prosecuted in good faith and that the Debtor should be afforded a reasonable time in which to propose a plan of reorganization sufficient to pay all the creditors which it owes.

## CONCLUSIONS OF LAW

■ The standard to be applied in determining whether a petition brought under Chapter 11 should be dismissed as a "bad faith filing" is well delineated in a number of cases which are controlling in this jurisdiction. See *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir.1984); *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir. 1987); *In re Phoenix Picadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988). These cases stand generally for the proposition that a bankruptcy court may dismiss a petition which is filed in bad faith. Further, the Court has discretion to retroactively annul the stay so as to permit an action taken subsequent to the filing to be ratified and validated. See *Albany Partners, supra* at

675. Some of the factors in determining whether or not there has been a bad faith filing include:

1) Whether there is a reasonable possibility of an effective reorganization of the debtor. *Albany Partners*, 749 F.2d at 674;

2) Whether the debtor is a so called single asset debtor. *Phoenix Picadilly*, 849 F.2d at 1394;

3) Whether the debtor has relatively few unsecured claims whose claims are small in relation to those of secured creditors. *Id.*

4) Whether the debtor has a limited number of employees. *Id.*

5) Whether the asset of the debtor is subject to a pending foreclosure action as a result of arrearages on the indebtedness. *Id.*

6) Whether the debtor's financial problems involve largely a dispute between the Debtor and secured creditors which can be resolved in a pending State Court action. *Id.* at 1394.

7) Whether the timing of the debtor's filing evidences an attempt to delay or frustrate the legitimate efforts of the secured creditors to enforce their rights under state law. *Albany Partners*, 749 F.2d at 674; *Phoenix Picadilly*, 849 F.2d at 1394.

See also *In re W & L Land Company*, Case No. 288–00246 (Bankr.S.D.Ga. Jan. 30, 1989).

"[A] possible equity in the property or potential successful reorganization ... cannot transform a bad faith filing into one undertaken in good faith." *Phoenix Picadilly*, 849 F.2d at 1395.

■ As applied to the facts in this case, there can be no doubt that this case was filed in bad faith. Every one of the facts for assessing the degree of good or bad faith by a Chapter 11 debtor in this court evidences bad faith on its part.

1) There is no reasonable prospect of an effective reorganization in sight. This property has been unsuccessfully marketed for over two years. Since December 1988 two prospective sales have

evaporated. There is no contract to sell, no financing committed, and an outstanding loan which has been past due since at least October 1, 1988.

2) This debtor is, in essence, a single asset debtor. Counsel argues that Oakbrook's "acquisition" in April or May of 1988 of a 25% interest in a partnership which owns a residential duplex worth less than $50,000.00 eliminates this factor. Such is not the case. First it is not clear that Oakbrook is as yet vested with title to that 25% interest by conveyance, and if it is, whether it became vested with that asset before or after May 2nd when this case was filed. Assuming that Oakbrook did timely acquire that interest, the partnership is of such insignificant value that it cannot be seriously regarded as changing the fact that this debtor's only meaningful asset is the million-dollar apartment complex. The timing of the acquisition of that partnership interest suggests strongly that it was a sham, intended merely to insulate the debtor from another dismissal. This court will not tolerate such transparent gamesmanship.

3) The relative magnitude of secured and unsecured claims factor is clearly met. The twelve or so unsecured creditors hold approximately $7,000 in claims as contrasted with $1.7 million in secured debt. Moreover, Debtor's schedules assert that there are *no* unsecured creditors. For the purpose of a good faith analysis Debtor ought perhaps to be bound by its own representation.

4) Mr. Howard is the sole employee of Oakbrook.

5) Pendency of a foreclosure. Need I say more?

6) Pending State Court litigation. This factor is not relevant on the facts presented.

7) Intent to delay and frustrate legitimate creditor action. As previously set forth, this case was filed on the morning of a scheduled foreclosure of the real estate by the holder of a first priority deed to secure debt. The debt had been due and payable in full since October 1, 1988 and

was in default because of the unconsented to transfer to debtor in violation of the terms of the note and deed to secure debt. Debtor had previously filed a Chapter 11 to halt an earlier foreclosure on the day before the scheduled date of sale. No purpose other than the frustration of the Movant's legitimate interests has been demonstrated as the motivation for either filing.

■ Beyond the application of these established factors I note the following factors not evidenced in prior cases but which also evidence bad faith.

1) The Debtor is not only a single asset debtor but became the owner of the subject real estate with knowledge that its acquisition of the real estate would constitute an event of default under the note.

2) The acquisition of the real estate was close in time to the date the entire principal and interest on the first deed to secure debt became due and payable.

3) The acquisition of the real estate involved the infusion of no new capital into the apartments. Worse, the debtor has allowed the property to deteriorate, has put off needed repairs, and has converted essentially all of the rents received since December 1988 to its use without paying debt service and many of its accruing obligations.

4) Debtor's principal has shown a total disregard for the obligations of a corporate debtor-in-possession in the handling of funds and the operation of the apartment complex. His statement that his handling of those funds is the "normal" way that close corporations are operated, if true, is more an indictment of small business practices than evidence which would exonerate his own disregard of corporate responsibility.

5) Debtor has flagrantly violated the obligations imposed on it while operating as a debtor-in-possession in the prior case. Immediately upon the announcement by Judge Baynes that the case "shall" be dismissed Mr. Howard acted to have funds withdrawn from a debtor-in-possession account, in a manner to frus-

trate tracing, and forwarded to him. This violated the terms of Judge Baynes' prior cash collateral order which prohibited such use without court approval. Debtor allegedly relied on the statement that the case would be dismissed *in futuro*, upon submission of a written order, as authority to convert the funds to his own use. The case was not dismissed when he took the money. Nor had Judge Baynes' order prohibiting his use of cash collateral been amended. When the order dismissing the case was entered, Debtor had been ordered to pay the funds held pursuant to the cash collateral order to Movant. Debtor has not done so and stands in violation of both of Judge Baynes' orders. (Exhibits M–1, M–2 and M–9).

6) Debtor's prior case was dismissed as a bad faith filing pursuant to an order that was not appealed. Under principles of collateral estoppel I do not believe that Debtor can raise in this Court any issue that the prior finding of Judge Baynes is not binding.[1] However, I do, independently find from all the facts and circumstances that the prior filing was made in bad faith. Therefore, to sustain this filing Debtor must show some change in circumstances subsequent to the prior dismissal to justify its good faith. Debtor has not shown such change in circumstances between the dismissal of the prior case and the filing of this case to justify a different conclusion as to this case. The only possible changed circumstances are:

(a) The acquisition of the 25% partnership interest which I have previously determined to be insufficient to alter the fact that this debtor is in reality, a single asset debtor.

(b) The pendency as of May 2nd of the "Shippey contract". However, the evidence is clear that Mr. Shippey could not close because his financing contingency would not be met and that Debtor was aware of the status at all times. Indeed, Debtor was aware April 19th when the option agreement with Bradley/Bramar was conceived, that the Shippey contract was moot.

(c) The involvement of Mr. Bradley and Bramar after April 19th. In the first instance, no written contract existed as of the May 2nd filing and Debtor likely had no enforceable rights against Bradley or Bramar as of then. Moreover, even the written contract does not bind either Bramar or Bradley to do anything tangible for the Debtor. It simply states that they will exercise their best efforts on behalf of the Debtor. There is no evidence that the infusion of their best efforts will have any positive impact on the Debtor's prospects for a successful rehabilitation.

## ORDER

■ Consequently, there being no justification for a finding of any changed circumstances in the Debtor's situation since the dismissal of its previous case I conclude that the within case was also filed in bad faith. Pursuant to 11 U.S.C. Section 362(d) the automatic stay is annulled to permit Movant to record evidence of its foreclosure under state law and pursue any additional remedies it may possess under state law.

I do not at this time dismiss the case. Rather I hold the Motion to Dismiss under advisement pending a recommendation from the United States Trustee following the conclusion of the creditors' meeting in this case. I reserve the right to dismiss this case at any time with or without notice to any party.

---

1. See generally *In re Halpern,* 810 F.2d 1061 (11th Cir.1987). The elements for applying collateral estoppel to preclude relitigation of matters are:
    (1) The issue at stake must be identical to the one involved in the prior litigation;
    (2) The issue must have been actually litigated in the prior litigation; and
    (3) The determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action.
    All these elements are present in the case at bar.

With respect to sanctions, I find that the filing of this case was in violation of the requirements of Bankruptcy Rule 9011. However, no evidence was submitted as to expenses sustained by Movant or as to what an appropriate sanction might be. At the very least, however, the fee received for representation which is found to be violative of Rule 9011 should be forfeited. I, therefore, require Debtor's counsel to pay into the registry of this Court the sum of $1,000.00 which represents the retainer paid for his services in this case. Debtor's lead counsel and all associate counsel are also directed to file the application and disclosure required by Bankruptcy Rule 2016, within ten (10) days from the date of this Order.