### In the Matter of COASTAL NURSING CENTER, INC., Debtor.

### In the Matter of TYBEE ISLAND NURSING CENTER, INC., Debtor.

### FIRST AMERICAN BANK OF GEORGIA, Movant,

### v.

### COASTAL NURSING CENTER, INC., and Tybee Island Nursing Center, Inc., Respondents.

**Bankruptcy Nos. 93–40898, 93–40899.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Aug. 25, 1993.

---

See also, 162 B.R. 918.

Gary M. Wisenbaker, Savannah, GA, for debtors.

Kathleen Horne, Savannah, GA, for creditor/objector.

## MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Chief Judge.

Debtors in the above-captioned case filed a Chapter 11 petition on June 1, 1993. Movant, First American Bank of Georgia ("First American Bank") filed an Emergency Motion for Relief from Stay alleging that Debtors' Chapter 11 filings were in bad faith and that, under applicable authorities, relief from the automatic stay should be granted to allow Movant to enforce its foreclosure rights granted under state law. A foreclosure sale was scheduled for the first Tuesday in June, that being June 1, 1993, and pursuant to an emergency telephonic conference on May 31, 1993, I authorized Movant to conduct the sale but to refrain from recording a deed of foreclosure pending the outcome of the hearing on this motion. After a full evidentiary hearing on July 1st and 2nd, 1993, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Debtor, Coastal Nursing Center, Inc. ("Coastal"), and Debtor, Tybee Island Nursing Center, Inc. ("Tybee)", are two of a number of affiliated corporations whose sole shareholder is Karen Hagan. Mrs. Hagan also serves as the sole director and president of both Debtor corporations.

Each of the Debtors owns a parcel of real estate on Tybee Island, Chatham County, Georgia, upon which a nursing home is located. Movant First American Bank is the holder of a first deed to secure debt on both parcels of property securing a note in the amount of $2.8 million originally executed by Karen Hagan's husband, Robert Hagan, a prior owner of both parcels of real estate. The nursing home located on Tybee's property is known as the Savannah Beach Nursing Center and is operated by Savannah Beach Nursing Center, Inc., one of Karen Hagan's affiliated corporations. The nursing home located on Coastal's property is known as Oceanside Nursing Center and is operated by the Oceanside Nursing Center, Inc., another of Karen Hagan's affiliated corporations. Both Oceanside Nursing and Savannah Beach Nursing occupy the real estate of the debtor corporations by virtue of a lease from the respective Debtor as lessor to Oceanside or Savannah Beach, as a result of which Oceanside and Savannah Beach are obligated to make certain lease payments to Debtors. When Debtor Tybee's Chapter 11 petition was filed it scheduled the value of its real estate at $925,000.00. When Debtor Coastal filed its Chapter 11 petition it valued its real estate at $1,575,000.00.

As previously noted, both parcels of real estate were originally owned by Robert Hagan. Robert Hagan is the husband of Karen Hagan, who is the current president and sole shareholder of both debtor corporations. Mr. Hagan originated his loan with First

American Bank on July 29, 1988. On April 15, 1991, Robert Hagan filed a Chapter 11 proceeding in the United States Bankruptcy Court for the Northern District of Georgia. Four days later, on April 19, 1991, a trustee was appointed to administer the Chapter 11 estate. As a result, the trustee took over possession of the real estate and the nursing homes located thereon, and assumed responsibility for their management. In August of 1992 the trustee filed a notice of his intent to abandon the real estate on which the two nursing homes were operated. A notice from the United States Bankruptcy Court for the Northern District of Georgia issued to creditors indicating that the proposed abandonment would be approved if no objection was filed by a party in interest. *See* Exhibits M-5 and M-7. In the absence of objection, in August of 1992, the Chapter 11 trustee of Robert Hagan's estate abandoned any interest in the two parcels of property which are the subject of these two Chapter 11 proceedings.

That act vested title to the real estate in Robert Hagan, subject to the First American debt. On September 30, 1992, Robert Hagan, conveyed by quit claim deed his interest in those properties to Cimmeron Properties, Inc., another of Karen Hagan's wholly owned corporations. No consideration was paid Robert Hagan in exchange for that transfer. *See* Exhibits M-9 and M-10. Cimmeron Properties, Inc., conveyed, by quit claim deed dated March 9, 1993, the same real estate to debtors, Coastal and Tybee, respectively and received no consideration in exchange for that transfer. *See* Exhibits M-11 and M-12. On the same date debtors Tybee and Coastal executed leases to the operating corporations, Savannah Beach Nursing Center, Inc., and Oceanside Nursing Center, Inc., as previously outlined. *See* Exhibit M-13.

On April 7, 1993, an order granting relief from stay to permit First American Bank to exercise its state law remedies with respect to the debt of Robert Hagan was entered by the Honorable Stacey W. Cotton, United States Bankruptcy Judge for the Northern District of Georgia. *See* Exhibit M-8. First American Bank thereafter began advertising a non-judicial foreclosure of the two parcels of real estate pursuant to the provisions of Georgia law. At some time after the initiation of the foreclosure advertisement, Robert Hagan filed a motion to enjoin or to obtain a temporary restraining order to halt the pending foreclosure action. On May 27, 1993, by order of the Superior Court of Fulton County, the motion for temporary restraining order was denied. *See* Exhibit M-14.

Robert Hagan, the former owner of the real estate, continues to actively manage both nursing homes as an employee of Cimmeron Health Care, Inc., another wholly owned corporation of Karen Hagan, which provides management and oversight functions for these two nursing homes as well as four others owned by the Hagans or corporations which they control.

The current indebtedness which encumbers the two parcels of real estate owned individually by the debtor corporations amounts to $2,580,058.60 principal, and $479,576.10 in accrued interest through June 8th, for a total indebtedness of $3,059,634.70. In addition the two parcels are encumbered by a second deed to secure debt held by Ed Towns who is owed $200,000.00. It is conceded that there are some unpaid 1992 ad valorem taxes due on the real estate. However, neither debtor owes any other creditor any money according to the schedules filed with the court, and neither Debtor has any employees on payroll.

It is uncontradicted that, as a result of these transactions, the debtor corporations have no operating business and no source of income other than the ownership and leasing of real estate on which the nursing homes are operated by lessees, which are affiliated corporations. An examination of the terms of the leases reveals that the lessees have agreed to pay the Debtors, as lessors, an amount sufficient to fund the monthly mortgage payments in favor of First American Bank but that said payment commences only after the debts encumbering the properties have been refinanced. It is uncontradicted that no monies have been paid to either Debtor by Savannah Beach Nursing Center, Inc., or Oceanside Nursing Center, Inc., pur-

suant to the terms of the lease since the execution of those leases in March of 1993.

Debtor has filed a reorganization plan for future consideration by the court but as yet there is no approved disclosure statement of record and thus the plan cannot be, pursuant to the provisions of 11 U.S.C. Section 1125, disseminated to creditors for their consideration. Debtors anticipate the ability to fund their plans through a combination of lease payments and an agreement by Cimmeron Health Care, Inc., to lend to the debtor the management fees it collects for managing the two nursing homes. From all sources Debtors expect approximately $50,000.00 per month to fund their plans, and testimony was uncontradicted that the financial condition of the debtor has improved as a result of an increase in the rate of reimbursement for its Medicare and Medicaid patients from the Georgia Department of Medical Assistance which became effective July 1st.

Debtors' projections, however, were contingent upon the reinvestment or the loaning of the management fees by Cimmeron Health Care, Inc., and further assumed that there would be no increased costs associated with the operation of either nursing home. Over the past six to eight months since the abandonment by the Trustee and the sale of stock in the operating companies, Savannah Beach Nursing and Oceanside Nursing have taken steps to improve the facilities and to enhance the operations' financial stability. There was testimony that approximately $160,000.00 had been expended in catching up past due taxes, accounts payable and in purchasing appliances, linens, draperies, and other matters that had allegedly been neglected during the period of the Trustee's operation of the nursing homes. Some dispute arose during the hearing as to whether the Movant is in fact the holder of the note and deed to secure debt which is the subject of this motion as the result of a previous assignment of that and other collateral to SouthTrust Corporation. (Exhibit D–4). However, the testimony was uncontradicted and documents subsequently introduced revealed that the assignment to SouthTrust was for collateral purposes only and was not an absolute assignment and that SouthTrust has reconveyed that collateral assignment to First American Bank. *See* Exhibit M–24.

In partial response to the assertion that the filing of this Chapter 11 constitutes a bad faith filing under applicable law, the Debtors argued that First American Bank was guilty of misconduct in the manner it handled a loan request of Karen Hagan beginning in the Spring of 1992. The evidence reveals that because of the pendency of her husband's Chapter 11 there were discussions between Mrs. Hagan and her representatives and representatives of the Bank concerning her assuming responsibility for the loan from her husband. Those negotiations resulted in a letter dated April 23, 1992, from the Bank's counsel setting forth a counter proposal to an earlier offer apparently extended by Mrs. Hagan. *See* Exhibit D–5. That counter proposal was expressly "subject to board approval." Mrs. Hagan accepted the counter proposal as evidenced by Exhibit D–6. Thereafter, Mr. Richard Gaudet, the account officer for First American Bank, presented the proposal to the Board of Directors and apparently after some weeks of discussion the board declined to authorize the loan on the terms that had tentatively been agreed upon. On August 14th draft loan documents containing new terms approved by the Board were forwarded to Mrs. Hagan's counsel and her counsel responded by questioning whether First American Bank had lived up to its previous commitment. *See* Exhibits D–8 and D–9. It was uncontradicted, however, that Richard Gaudet had spoken with Robert Hagan following the Board's declining approval of the loan under the original terms and that Hagan informed Gaudet that the Hagans would go forward with the loan including the alterations insisted upon by the Bank. Ultimately, however, Mrs. Hagan declined to consummate the transaction in the form required by the Bank.

During the period of these negotiations, Mrs. Hagan purchased from the Chapter 11 Trustee, Robert Hagan's fifty percent stock ownership in Oceanside Nursing Center, Inc., and Savannah Beach Nursing Center, Inc., and paid the sum of $25,000.00 in exchange for that conveyance. Her payment of the $25,000.00, however, was in exchange for her

husband's stock in the operating companies. It did not form any of the consideration for the acquisition by the debtor corporations of the real estate which had been abandoned by the Trustee and conveyed by Mr. Hagan to Cimmeron Properties and ultimately to the Debtors without consideration.

The loan originally obtained by Mr. Hagan in 1988 matured by its terms in July of 1993. It was uncontradicted that no payment has been made to First American Bank on the note since August of 1992 and that payments have accrued at a rate of $28,000.00 per month. There has been no agreement on the part of First American Bank to a moratorium in payments. First American Bank was informed by representatives of the Debtor or affiliated companies that during the period that certain expenses were being caught up and capital expenditures made that there would be no payments on the note, but First American Bank never consented to that decision on the part of the Debtors.

The Movant contends that, based on the evidence, a classic case of bad faith filings has been established and accordingly, the automatic stay should be lifted or annulled pursuant to 11 U.S.C. Section 362(d)(1) to allow Movant to enforce its rights under state law. Specifically, Movant contends that Debtors are single-asset debtors, that neither Debtor has any income, that neither Debtor has any employees, that there are no unsecured claims, that the Chapter 11 was filed only to frustrate the state law remedy being exercised by the Movant, that the filing was made by a new debtor which had acquired title to the property after a lengthy prior Chapter 11 and thus the "new debtor syndrome" or serial filing elements of a bad faith case are present.

The Debtors contend that the Bank itself has unclean hands as a result of the failed transaction with Mrs. Hagan. Debtors argue that the operating companies' ability to make lease payments from which the Debtors can fund the plan is far more feasible based on current conditions than during the past year and that Debtors are entitled to the breathing spell contemplated under the Bankruptcy Code in which to attempt to reorganize, to formulate a disclosure statement and plan, and to have the same confirmed.

## CONCLUSIONS OF LAW

The requirement that a debtor file a Chapter 11 petition in good faith is no longer expressly provided for in the Bankruptcy Code. *See* Section 141 of The Bankruptcy Act of 1898 (expressly requiring that a petition for reorganization under Chapter X of the Act be filed in "good faith"). Nonetheless, courts which have considered whether such a requirement still exists have uniformly held that a bankruptcy court, sitting as a court of equity, possesses the inherent power to determine whether a debtor has improperly invoked its jurisdiction by coming into the court in bad faith. *See e.g., In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984); *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988); *In re Natural Land Corp.,* 825 F.2d 296 (11th Cir.1987); *Matter of Oakbrook Village, Inc.,* 108 B.R. 838 (Bankr.S.D.Ga.1989); *Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986); *Carolin Corp. v. Miller,* 886 F.2d 693 (4th Cir.1989); *In re North Redington Beach Assoc., Ltd.,* 91 B.R. 166 (Bankr. M.D.Fla.1988); *Furness v. Lilienfield,* 35 B.R. 1006 (D.Md.1983); *Duggan v. Highland—First Ave. Corp.,* 25 B.R. 955 (Bankr. C.D.Cal.1982); *In re Corp. Deja Vu,* 34 B.R. 845 (Bankr.Md.1983); *Matter of Dunes Casino Hotel,* 63 B.R. 939 (D.N.J.1986); *Matter of Century City, Inc.,* 8 B.R. 25 (Bankr.N.J. 1980); *In re Thirtieth Place, Inc.,* 30 B.R. 503 (9th Cir. BAP 1983). As the Fifth Circuit stated when it held that the requirement of good faith applies to a petition filed under Chapter 11 of the Code:

[The good faith standard] furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy.... Moreover, a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful, equitable weapons (i.e., avoidance of liens, discharge of debts, marshalling and turnover of assets) available only

to those debtors and creditors with "clean hands."

*Matter of Little Creek Development Co.,* 779 F.2d at 1072.

■ A Chapter 11 petition filed in bad faith may be "cause" for a court to grant relief from the automatic stay under section 362(d)(1), as well as for dismissal of a case under section 1112 of the Code. *See In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394; *In re Albany Partners, Ltd.,* 749 F.2d at 674; *Matter of Oakbrook Village, Inc.,* 108 B.R. at 844.

Although it is clear that a bankruptcy court possesses the power to grant appropriate relief when it finds that a Chapter 11 petition has been filed in bad faith, there is some disagreement between the Circuits as to the standard to be employed when determining whether a petition has in fact been filed in bad faith. *Compare In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (holding that a court should focus solely upon the subjective good faith of the debtor at the time it filed its Chapter 11 petition regardless of the debtor's prospects for reorganization) *with Carolin Corp. v. Miller,* 886 F.2d 693 (employing a two-pronged test which requires a court to find not only subjective bad faith on the part of the debtor but also "objective futility" (i.e. debtor has no reasonable prospect of reorganization)).

The principal difference between these two approaches is the emphasis placed upon "objective futility". Under the Fourth Circuit's test, "objective futility" is a separate inquiry which must be considered apart from the issue of the debtor's subjective good faith in filing. *Carolin Corp. v. Miller,* 886 F.2d at 701. Both conditions must exist, subjective bad faith and "objective futility", before a court can find that a petition has been filed in bad faith and grant the appropriate relief.

■ In contrast, the Eleventh Circuit considers "objective futility" merely as one of several nonexclusive circumstantial factors indicative of a debtor's subjective good faith in filing its Chapter 11 petition. *In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394; *In re Albany Partners, Ltd.,* 749 F.2d at 674. As the Court stated in *Phoenix Piccadilly,*

"there is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, the courts may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions, or in particular factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394 (*quoting in part In re Albany Partners, Ltd.,* 749 F.2d at 674).

This court is bound by the decisions of the Eleventh Circuit. Accordingly, I will analyze the Debtors' petitions in accordance with the standards which the Court has adopted in dealing with this issue.

■ Although the Eleventh Circuit employs a flexible test for determining whether a petition has been filed in bad faith, the Court has, in the course of its several opinions on this issue, identified certain circumstantial factors as being indicative of a debtor's bad faith in filing its Chapter 11 petition. These factors include:

1) Whether the debtor has only one asset, usually real estate, in which it does not hold legal title (a so called "single-asset" debtor);

2) Whether the debtor has few unsecured creditors whose claims are small in relation to the claims of secured creditors;

3) Whether the debtor has a limited number of employees;

4) Whether the property is the subject of a foreclosure action as a result of arrearages on the debt;

5) Whether the debtor's financial problems involve essentially a dispute between the debtor and its creditors holding an interest in the real estate which can be resolved in the pending state court action;

6) Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

7) Whether there is a reasonable possibility of an effective reorganization of the debtor.

*See In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394; *In re Natural Land Corp.,* 825 F.2d at 298; *In re Albany Partners, Ltd.,* 749 F.2d at 67.

■ Applying the these factors to the cases at bar, I reach the following conclusions:

1) Both Debtors are "single-asset debtors". Each Debtor holds, as its only asset, a single parcel of real estate located on Tybee Island, Chatham County, Georgia.

2) The schedules filed by the Debtors with this Court indicate that neither Debtor has any unsecured creditors other than a priority tax claim for 1992 ad valorem property taxes assessed against the both parcels.

3) Neither Debtor has any employees on its payroll. Moreover, Debtors have not engaged in any significant business operations since their formation in September of 1992.

4) The primary debt which encumbers both parcels of real estate is owed to First American Bank. Robert Hagan originated this loan on July 29, 1988, and pledged both parcels of land as security. Payment on the loan has not been made since August of 1992, and accordingly, payments are accruing at a rate of $28,000.00 per month. First American's foreclosure on these properties has been the direct result of the arrearages on Robert Hagan's loan.

5) First American Bank holds a first priority deed to secure debt in Debtors' properties securing a debt which totals approximately $3,059,634.70. Debtors' only other creditor is Ed Towns, who holds a second priority deed to secure debt in both properties securing a debt in the amount of $200,000.00. Debtors list no other creditors in their schedules except Chatham County, which is owed for the unpaid 1992 ad valorem taxes on the properties.

The Hagans and First American Bank have been negotiating to restructure and refinance the debt which encumbers Debtor's real estate since August of 1992, when the Trustee in Mr. Hagans' Chapter 11 case abandoned the property. The parties proceeded through a series of proposals and counter-proposals with regard to refinancing the debt, and allegations arose that First American had breached a promise or otherwise not lived up to its commitment relating to one of the proposals. As negotiations started to break down, First American Bank began advertising the subject properties for foreclosure. Debtors sought to enjoin the foreclosures or obtain a temporary restraining against First American Bank to halt the foreclosures and, by Order of the Superior Court of Fulton County, were denied relief. Debtors now come into this court seeking to accomplish what they could not outside of bankruptcy; the halting of the foreclosure actions and the restructuring of their indebtedness to First American Bank.

I conclude that Debtors' financial problems involve a two-party dispute between the Hagans and First American Bank. I further conclude that this dispute, including any allegations by Debtors and the Hagans of wrongdoing on the part of First American Bank in the manner in which it negotiated the refinancing of debt, can best be resolved in the Georgia State Courts.

6) Both of the subject properties have previously been the subject of Robert Hagan's lengthy Chapter 11 reorganization, and were eventually abandoned by the Trustee appointed to administer Mr. Hagans case as having no value to the estate. Having been granted relief from stay in Mr. Hagan's case, First American Bank was then forced to defend its foreclosure on the properties in state court when debtor filed a motion to enjoin or obtain a temporary restraining order restraining First American from proceeding with the foreclosure. Debtors' motion was denied. On June 1, 1993, the morning both parcels of land were scheduled to be sold at foreclosure, Debtors filed their Chapter 11 petitions in this Court with the sole intention of stopping the foreclosure. As Debtors state in their Trial Brief:

> When it became clear that the assets belonging to these Debtors were going to be foreclosed on and taken out of their possession and control, these Debtors filed their Petition for relief under Chapter 11 of the United States Bankruptcy Code ...

Debtors' Trial Brief on First American Bank's Emergency Motion for Relief From Stay Based Upon Bad Faith Filing, at 8.

I therefore conclude that the timing of Debtors' filing evidences an intent to delay and frustrate the legitimate efforts of First American Bank to enforce its right of foreclosure as granted under state law.

7) Debtors have no equity interest in their respective parcels of real estate and no current income from which to make payments on their debts to First American Bank and the second lien holder. They have, however, presented plans of reorganization for future consideration by the court in which they estimate that they will be able to generate approximately $50,000 from which to fund their plans. Therefore, it is too early in the case for this court to accurately assess whether Debtors have a reasonable possibility of effective reorganization.

Despite the inability to reach a conclusion under factor number seven as to Debtors' reasonable prospect of reorganization, the foregoing analysis strongly suggests that Debtors' petitions have been filed in bad faith, and would in fact, be sufficient evidence to find the both Debtors had filed their petitions in bad faith under the Eleventh Circuit's holding in *Phoenix Piccadilly*. However, in addition to the factors listed above, I consider the following factors as further evidence of Debtors' bad faith.

### New Debtor Syndrome

■ First American Bank contends the circumstances surrounding the filing of Debtors' Chapter 11 petitions are symptomatic of the so-called "new debtor syndrome". *See* Movant's Brief in Support of Motion for Emergency Relief From Stay, at 12. "New debtor syndrome" is a term of art which describes a set of circumstances indicating that an asset has been transferred to a newly created shell corporation immediately before the corporation files for bankruptcy for the purpose of evading creditors' rights. *See generally* H. Miles Cohn, *Good Faith and the Single–Asset Debtor*, 62 Amer.Bankr.Law Jour. 131 (1988). This tactic has the dual benefit of simultaneously shielding the asset from creditors and isolating it from the healthier portions of an owner's business.

Creditors are prevented from pursuing their state law remedies against the asset because the new corporation files for bankruptcy soon after receiving title to the asset. At the same time, the troubled asset is isolated from the rest of an owner's business so that none of his healthier assets are subject to the burdens and intrusions of bankruptcy. Several courts have held that when a debtor has received an asset under circumstances which are characteristic of the "new debtor syndrome", there is evidence of a bad faith filing. *See e.g., Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986); *Duggan v. Highland—First Avenue Corp.,* 25 B.R. 955 (Bankr.Cal.1982); *In re Thirtieth Place, Inc.,* 30 B.R. 503 (9th Cir. BAP 1983); *In re Corp. Deja Vu,* 34 B.R. 845 (Bankr.Md. 1983).

■ Circumstances which are indicative of the syndrome, in addition to the factors set forth in *Phoenix Piccadilly*, include:

1) A new entity was formed for the purpose of filing a case under the bankruptcy statute;

2) The only assets transferred to the debtor were in imminent and substantial danger of loss by foreclosure sale;

3) The only significant creditors were the creditors seeking foreclosure;

4) The filing of the case was not precipitated by nor related to other creditor pressure;

5) The debtor had no cash flow of substance or any other means to service the encumbrances on his property;

6) The debtor neither conducted nor engaged in any business activities of significance since its formation except to resist foreclosure and file the bankruptcy case.

*Duggan v. Highland—First Avenue Corp.,* 25 B.R. at 961.

■ Applying these factors to the case at bar, I reach the following conclusions:

1) Debtors were incorporated in September of 1992, one month after the subject real estate was abandoned by Robert Hagan's Chapter 11 Trustee, but were both dormant corporations until they acquired their respec-

tive parcels of real estate from Cimmeron Properties, Inc. by quit claim deed dated March 9, 1993. At the time of the transfers, Robert Hagan had been in default on the loan which encumbered both parcels for approximately six months, no payments having been made to First American Bank since August of 1992. Nevertheless, by the terms of the leases Debtors executed with the affiliated nursing home management companies on the same date, Debtors agreed to forgo the receipt of any rents, from which First American's debt could have been serviced, until the loans were refinanced or a plan of reorganization was confirmed. On June 1, 1993, less than three months after taking title to their respective properties and on the morning of foreclosure, Debtors filed for bankruptcy to prevent both of the properties from being sold at foreclosure.

The Hagans knew, or should have known, that the Debtor corporations would be forced to file a petition in bankruptcy to prevent foreclosure when the loan encumbering the properties was approximately six months in default and the leases executed by the Debtors meant that Debtors would be completely deprived of any income from which they could service the debt encumbering the properties. I therefore conclude that both Debtors were formed for the purpose of filing petitions in bankruptcy.

2) As noted above, the only assets transferred to the Debtors were the two parcels of real estate. Both parcels were clearly in danger of being foreclosed upon when they were transferred to the Debtors on March 9, 1993.

3) First American Bank holds a first priority deed to secure debt on both parcels, and is the only creditor who seeks foreclosure. The properties are also encumbered by a second deed to secure debt in the amount of approximately $200,000.00. However, when compared to the approximately $3,059,634.70 that First American Bank is owed, Mr. Towns' debt is rather small. Therefore, I conclude that First American Bank, who has been seeking foreclosure for some time, is Debtors' only significant creditor.

4) Debtors' sole intent in filing this case was to forestall foreclosure on the two par-

cels of real estate. *See* discussion *supra* p. 797; Trial Brief on Movant's Emergency Motion for Relief From Stay Based Upon Bad Faith Filing, at 8. There is no evidence that the filing of their cases was precipitated by other creditor pressure.

5) By virtue of Debtors' lease agreements with the related operating corporations, Debtors currently have no income or other means with which to service the encumbrances on the subject properties.

6) Debtors only business activity of significance has been to resist foreclosure on their respective parcels of land and file their Chapter 11 petitions in this Court. Debtors have no ongoing business activity whatsoever.

Based on the application of the foregoing factors, I conclude that the circumstances surrounding Debtors' bankruptcy are indicative of the "new debtor syndrome" and are further evidence of bad faith. The Hagans have attempted to isolate the two parcels of real estate from their healthier nursing home management business while simultaneously shielding the troubled assets from First American Bank's legitimate attempts to exercise its right of foreclosure by transferring the properties to the Debtors and causing them to file for bankruptcy.

### Serial Filing

■ Debtors' filings in this Court have many of the elements of a serial filing. Both parcels have previously been the subject of Mr. Hagan's personal Chapter 11 reorganization, and were abandoned by the Trustee appointed in that case because neither parcel had value to the estate. After the trustee abandoned them, Robert Hagan caused the properties to be transferred to the Debtors via Cimmeron Properties, Inc. Robert Hagan's wife, Karen Hagan, is the sole owner and president of both Debtors, as well as Cimmeron Properties, Inc. Robert Hagan continues to actively manage the nursing homes located upon the subject properties through his employment by Cimmeron Health Care, Inc., which provides management and oversight services to both homes.

The transactions between Cimmeron Properties, Inc. and the Debtors whereby Debtors took title to the subject properties was clear-

ly not at arms-length. The properties were transferred from Robert Hagan to Cimmeron Properties, Inc. and finally to Debtors without consideration, and the leases executed in favor of the Hagan's nursing home management companies allow the home to operate rent-free until the loan encumbering the properties is refinanced or a plan of reorganization is confirmed.

Thus, under this arrangement, which has been in place since March 9th of this year, the Hagans remain in possession of both parcels of land through Karen Hagan's ownership of both Debtors while simultaneously operating their nursing home management companies without having to pay the economic value of the land upon which the two nursing homes sit. All this occurs at the expense of First American Bank, which has not received any payment on the debt since August of 1992 and has thus far been prevented from exercising its right of foreclosure granted under state law. Although this is not a serial filing in the same name as the prior debtor, these corporations are clearly "insiders" as defined by 11 U.S.C. Section 101(31) and this filing is in substance, the same as if Robert Hagan had dismissed and refiled his case in order to reimpose the automatic stay.

I therefore conclude that Debtors' petitions are tainted by elements of a serial filing and are further indicia of Debtors' bad faith.

### Conclusion

Based on the foregoing I conclude that Debtor, Coastal Nursing Center, Inc. and Debtor, Tybee Island Nursing Center, Inc. have filed their Chapter 11 petitions in bad faith. The purpose of the transfers of the parcels of land to the Debtors and their subsequent Chapter 11 petitions was to isolate the properties from the healthier portions of the Hagan's nursing home business while shielding them from First American Bank's attempts to exercise its right of foreclosure. At bottom, the Hagans are attempting to retain possession and control of the parcels of land because they are critical to the continued operation of their more lucrative nursing home operations, while at the same time, avoid having to adhere to the terms of the loan agreement made between Robert Hagan and First American Bank by using Chapter 11 as a mechanism to force First American to renegotiate the debt which encumbers the land. Such a purpose is not a proper use of the bankruptcy courts and is unmistakable evidence of bad faith on the part of both Debtors.

### ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the automatic stay is lifted and annulled pursuant to 11 U.S.C. Section 362(d)(1) to permit Movant, First American Bank of Georgia, to record evidence of its foreclosures under state law and pursue any additional remedies it may possess under state law.